Good morning, your honors. My name is Warren Bleeker. I represent the plaintiff and appellant Lodestar Anstalt. I'd like to reserve five minutes. May it please the court. I'd first like to start with the issue of the trademark use in this case, which occurred after the alleged infringement began. The district judge's ruling is in error. She refused to allow that as in the case. And in doing so, she violated the federal law guarantees that a trademark registrant has for trademark priority and for constructive use. Under the federal trademark laws in a Madrid protocol registration, the trademark owner files the registration based on an international registration that exists. The benefit of that is that the trademark owner then gets a priority date in the U.S. of the date where the international registration was issued. So in this case, that was a priority date of 2009. Then the federal registration issues. And under the statutory framework, the trademark owner then gets additional time to develop the product, market the product and start using the mark in the United States under the statute. So so it's a reasonable amount of time. I mean, they can't wait until like the eve of five years before they start using the mark under Madrid or is that your position? So under the statutory framework, you have to file a notice of use between the fifth year and sixth year after registration. That's when you're required to file the notice of use. Right. But to to maintain an filing have no actual use. And then if somebody starts using, you run in with a product and claim infringement. Can you do that under your theory? I believe the answer is yes, because the way the statute is set up, you have to have use before you can sue for infringement. But the federal landmark gives you time to develop your product. No. Well, in my hypothetical, there's there's no use. So there's a you know, there's a registration or an effective registration coming from the protocol and the mark holder has no use at all. Somebody comes in with something in the market that they think is an infringing product and then they run out with a competing product using the mark they've registered and now claim infringement. Does that work under your theory? Is there a problem with that? No, that that that works. That's the statutory framework. And that that ahead of the the infringing use, you can just then develop a product belatedly to come into the market and and then assert infringement. Yes, your honor, because that's the concept of statutory of constructive use. That's the theory is that it gives the owner time to develop the product. And then once there's you have to have use before you can sue for infringement. But once you have use, you get the benefit of the constructive use and the trademark priority provisions in the federal mark. Does it count as a bona fide use if if in my hypothetical, it's just in response to somebody else's using it? The fact that someone else allegedly infringed before you were before you were able to use your is irrelevant to the analysis, because what matters is when you have use, because once you have the actual use, then you have to make a declaration that you're actually going to have bona fide use. And then if you're not using it for years and then all of a sudden you just show up when somebody starts using it, it starts to look like a bit of a troll. Well, so that there is a limit. Obviously, there are limitations to that. So the way the statute is set up, you have to file your statement of use within five or six between the fifth and six years. In addition, there's the idea of abandonment and trademark law, which is if you don't use your mark for three years, there's a presumption of abandonment that has to be overcome. So you have to make a declaration of bona fide intention to use the mark right at the outset, correct? In this instance, the mark was used. It wasn't used on rum. It was used a little bit. I mean, not much, very little. Well, so I mean, that helps our case, but it's not necessary is that I think the short response. So you're right, Judge Berzon, it was used on whiskey in the United States. They had also... Even that was very, very little. Well, in the whole scheme of things, it wasn't a lot of use, but it was sufficient to establish trademark use. But it was also used in connection with rum products before the infringement began on a golden rum product. And the untamed mark was used in the very large font in connection with a golden rum product. Then after Bacardi started using Bacardi Untamable is when the untamed revolutionary rum came out. But when that product came out, that clearly is used. That's not being contested, but even by the district court. And when the use happens, you automatically get your statutory priority in constructive use states. But do you concede that the introduction of that product was motivated by Bacardi and as a response to him? Well, it was motivated to enforce the trademark rights. The whole statute is set up to encourage you to file- But this was... I'm just asking a factual question. You concede that there was no plan to introduce that product with that name and that use of the mark until after Bacardi had started with its use of what you considered an infringing mark? I think that what the record shows is that Lodestar had begun using the word untamed in very large font in connection with rum products before Bacardi. But the particular untamed revolutionary rum product came out after Bacardi started using its Bacardi Untamable mark. The record, as I recall, demonstrates that there was some number of cases of this new product shipped, not a whole lot. Does it show anything about whether there was a production plans, whether it was meant to actually rev up and try to become an active product in the United States? I'm sorry. So are you asking about in the other... There are other cases where this particular fact pattern has arisen? No, I'm asking about this case. In this case, does the record show... I mean, this goes to Judge Collins' bona fide intended question. Even if it was motivated at least in part and maybe in large part by Bacardi's use of the mark or something like the mark, but is there anything in the record about what the plan was with respect to this product? We know it was shipped in a fairly small number. Was there any record that there was production going on and a plan to ship more of it or anything like that? And you're referring to the untamed revolutionary rum product? Yes, that's what I'm referring to. Right. So I guess the broad-based answer is the motivation for use isn't a relevant factor under the statute. But the amount of use might be some relevant... I understand that for trademark use purposes, there's kind of a threshold and you're over the threshold. Let's assume you're over the threshold. But as to whether there was some other requirement or standard that the intent to use it be bona fide, i.e. not just for the purpose. I mean, your position, I gather, is that if it's just for the purpose of protecting the trademark, that's good enough. Suppose we didn't think so. What does the record show about what was the plan here? Anything? Well, the motivation behind... All the statute requires is that you use the mark. Right, but you're fighting my question, all right? So the answer to your question is this. The record shows that the motivation was to begin using untamed as a prominent feature of a mark well prior before the Bacardi infringement began. It started at the Miami Rum Renaissance Festival in 2013 when Lodestar had its golden rum. And in connection with that, it was the large untamed mark was in connection with that and the product was given to customers and they tried to... You're still fighting my question. So I gather that the answer to it is that there's nothing in the record to demonstrate that there was an intent to produce any substantial amount of this revolutionary untamed rum. Is that... I mean, one way or another. Is that the answer to my question? I guess the answer to your question is before infringement, there was the... It's a golden rum product. After the infringement, there were 2,000 cases of the untamed revolutionary rum product that were then imported in the United States and sold. And your question is what was the business plan or development plan prior to the infringement? I've had to know about five times. I'm sorry, Your Honor. So the plan was to begin using untamed in connection with golden rum products. I don't believe there was anything in the record that showed it was going to be used on the particular revolutionary rum product prior to the infringement, but there is evidence to show that untamed was being used prominently on golden rum products being shipped to the United States. And again, Your Honor, the business purpose of the company is to develop a mark and then to license it to a larger company. And so the plan wasn't to start competing on the Bacardi level at the same level that they sell goods. That's not Lodestar's business plan. Their business plan is to develop a brand for a niche market and then able to license that to a larger company. So the intent was never to sell hundreds of thousands of products. It was to establish a brand which had lots of value and then attempt to license that to a larger company. That is their business model, and that's exactly what they did. Whether a brand has value depends upon whether it's being sold and anybody's buying it. If it's sitting in somebody's back drawer, it's hard to believe it has value. Well, Your Honor, it depends because a brand, a certain company that has the resources to do a mass marketing and a mass manufacturing, it can be very valuable to that particular company. And the example I would give is Mr. Levy, the owner of Route 66 for cigarettes. It had very modest sales, not big sales at all, but he was able, because it was a good idea, it was a great brand idea, he was able to sell that and license that to a larger tobacco company who then used that idea and did the mass marketing of it and mass production. And Mr. Levy was able to, at the outset, earn $14 million and then an ongoing royalty, despite the fact that he himself didn't have the vast distribution network that a Diageo or a Lodestar can, because a Lodestar is a small niche organization that doesn't have the same, it's not as large as Bacardi or Diageo. I want to briefly address the damages issues because I So on the issue of damages, I'll start with the reasonable royalty. It's important to keep in mind that the whole reason why reasonable royalty is allowed in reverse confusion cases is it's there to prevent undercompensation. And it's to ensure that the infringer and not the victim bears the burden of the uncertainty. So the general standard for reasonable royalty is, is there sufficiently reliable basis in order for a jury to award reasonable royalty damages. But the problem is, I suppose, that Bacardi might have said, if they had come to us and said that we were, that they wanted to us to buy this license, we would have said no, we would have just changed our, stopped using Untameable, it wasn't worth it to us to pay for it. Well, the fact that the defendant wouldn't have, if their testimony is, well, we wouldn't have agreed to that, that's not a basis to claim that there's no reliable basis to award reasonable royalties. If that was the law. Well, but the question is whether you could assume that, I mean, the Georgia Pacific model assumes hypothetical negotiations, but it assumes that there would have been a negotiation. And if their testimony is, you know, we didn't care enough about this, we just wouldn't have done it at all. Why isn't that an entry problem, aside from the amount of the royalty? Other courts have allowed reasonable royalty damages, even where the defendant claims that they wouldn't have licensed the product. But second of all, there was additional evidence in this case from an industry expert who testified, he worked for Diageo, that large alcohol companies such as Diageo and Bacardi rarely internally develop these own ad campaigns. And they, in many instances, they purchase or license them from other entities. That happens at Diageo, that happens at Bacardi. So that is other evidence why it's reasonable to assume that in this particular case, a large alcohol company like Bacardi would, if they came up with an idea for untamable or untamed, that they would pay, in fact, they did pay another company to develop it in this case. So that is, so therefore it's reasonable to presume that had there been a hypothetical agreement, that Bacardi would have licensed another entity's branding campaign. That happens all the time in the alcohol industry, in fact, that's common. The other- Okay, you're just, you're out of time. Thank you, Your Honor. So, we'll give you a couple minutes to retire. Good morning, Your Honor. This is Michael Lynch, may it please the court. I'm here on behalf of Bacardi defendants in the case. I want to just go right at the issue that you raised on the plans for the untamed, the revolutionary untamed rum. There were plans, there's nothing in the record that that rum had any existence of any form prior to Lodestar seeing Bacardi's allegedly infringing conduct. Yes, but what about afterwards? I mean, his basic construct, as Mr. Bleeker has presented, seems pretty ripe. That is that the whole point of these intent to use trademarks is that you're not using them, you intend to use them, and therefore it seems I'm not exactly sure what the reason for ignoring the fact that you are, in fact, have a right to use them when you use them. And so, the only possibility is that it's sort of, as Colin said, that there's some screen for trolls, and therefore the question isn't what they did before, it's what they plan to do afterwards. Right, and so this is an intent to use application and the rights under that application to that mark don't ripen until use actually occurs. Right, and use did occur. I don't quite understand whether the holding below in your argument is that they don't have that right to use that they say they do, or that, or just that on an evidentiary basis, for some reason, the revolutionary untamed rum has to be backed out for determining what the confusion is. But you can't be saying that they don't have a trademark right to use that, a superior trademark right to use that. We're not arguing that, and the court below actually assumed that they had the right to sell this particular brand subsequently. So why are we backing out this use for purposes of confusion? Because the rights that developed were the rights that were actually in use in the did not deprive them of that use. That use was the basis of the comparison, and that's the use that occurred with the whiskey products. And then the court below even gave them the benefit of the doubt with respect to the rum. Why is it you need to say that you can use it and you have the superior right to use it, but you can't consider confusion with regard to it? Because that's what the right is. The right is not to have somebody else doing something that's confusing with regard to it. So your right to use it in this post-McCarty campaign period, you don't have the right to rely on that use for purposes of showing confusion. That's why it's an evidentiary issue, or what is it? No, no. I think the court's decision below was that the proper comparison was what was in the marketplace at the time of the alleged infringement. That's how you measure infringement. And so the court went and looked at the use that was in play at the time that the allegedly infringing conduct began. But where does that come from? I mean, because what distinguishes this case from the hypotheticals, more extreme hypotheticals I asked your opposing counsel, is that there was use in the marketplace, a very different use. It was a different product. It's on the back, and it's not all that prominent, but the mark was being used. And so that would normally give them rights. And if they see someone else coming in doing something else, why can't they then expand into that and say, you know, no dice. I get to do that in this area with my mark I'm using. So we're not saying they can't do that. What we're saying, though, is the measurement for infringement is confusion in the marketplace. But if they can do that, and the product, the new product would cause confusion, then why wouldn't that be relevant? Then was the district court wrong in setting that aside? No, the district court was not wrong. Well, first, we disagree that it would have been confusing anyway. But ultimately, the proper measurement is how it was used previously. And the fact that they then changed their use so dramatically, they depart completely from their prior use into an entirely new version of an entirely new product. What principle of law does that come from? I understand that that's the outcome you want. But what's the rule of law that gets you that outcome? Well, there's a number of them. First of all, infringement is measured by confusion in the marketplace at the time of the alleged infringement, number one. Number two. That's what you're saying. But this was at the time of the alleged infringement. I mean, the measure went on, and they now have a new product. So it was products were in the marketplace at the same time. But it is a subsequent, sorry, it was developed subsequent to the alleged infringement. It is not at the time of the alleged infringement. I don't know where, but you can see that, but I don't know where you're getting it from. Are we getting the law? Yes, where are you getting the rule? Let me ask you a specific related question. One of the Sleecraft factors is expansion of the use. That suggests that expansion of the use is relevant to confusion, i.e. if somebody says, I'm going to be using it now for something new, that seems to be a relevant Sleecraft factor. So it certainly suggests that a post-original infringement use is protected rather than not protected. The Sleecraft factor protects expansion of the use that's in use already into either new geographic areas or into new products. It does not extend protection to an extension into an entirely new use of the mark. Well, this is only entirely, I mean, they were using the mark. I mean, if they started using it on marshmallows, that might be different. But they didn't now put it onto marshmallows. They already were using it to some degree on rum, actually, and they were certainly using it on whiskey. So it was, and it seems to me, that's exactly what you think of expansion. So perhaps the way... More, and more prominently, but on rum, but it's not marshmallows. So perhaps the way to look at this is to look at the actual bottles. And it is not an extension of the existing use of the mark. The whole point here is that they altered their use of the mark. And remember, the rights derive from the usage under the Lanham Act. The Lanham Act is designed to protect the consumer from confusion in the marketplace. There is no confusion in the marketplace when it comes to the wild geese version of the rum. The only use of the word untamed, it appears on ER 9, which is page 7 of the district court's decision, is the best place to see it. And that's a blown up label. And so this is even bigger than you would see it in real life. On the back label, it's all that text. That is the use of untamed. You can't, what the court below is ruling, her ruling was, the judge's ruling was, you can't then pivot from that type of use into an entirely new use, which changes the commercial impression into an entirely new product, which is what you'll see on page ER 13, the untamed revolutionary rum. There's no indication of wild geese. There's no reference to the diamond encrusted skull. It is a new geese. But would you have an intent to use it? I mean, suppose they hadn't been using it at all beforehand. They still had a right to use it. So, well, that's a good point. Under the Madrid Protocol, the intent to use is cancelable at any time. You can lose it to abandonment at any time. You don't get five or six years free. They didn't. Everybody's afraid they didn't abandon it. Right. And they came in and they used it. I mean, our baseline is they didn't abandon it. And our fundamental point is the use that began with the, first with the whiskey and the untamed and the wild geese bottles, that use is what perfected the use in their intent to file application. So into their intent to use application. So they express an intent to use. It doesn't ripen and become protectable fully until they use it. And then when they use it, that's the use that can be protected and can be used in order to chase an infringer. What you can't do, and which is contrary to the Lanham Act and contrary to the purpose of the Lanham Act, is affirmatively change your use to chase another party, to go after another party for a manufactured. Do you have a case in the non Madrid context that stands for the proposition you just said that you can't change the use and create the infringement? And what's your best case for that? Well, your honor, you know, we haven't had a case that's directly important. I think it's because it's a little bit of a, frankly, it's a little bit of a ridiculous approach that you're going to allow a, you're going to allow someone to change their use of a mark to chase and create confusion. The point of the Lanham Act is to eliminate confusion. And you can't, you can't give someone the benefit of creating confusion. It's the exact opposite. So there's certainly... I mean, this issue just seems to be a category that we encounter fairly often, which is something that you can't believe there's not a definitive ruling on, but there is one. I mean, you would think that this question would come up fairly frequently outside. I understand that you're characterizing it, and it may be accurate that this was being done for some, this purpose, but suppose it wasn't. Suppose what happened, this is why I was asking the question about what was the plan. I mean, suppose they didn't just produce 2,000 cases of this. They produced, you know, a hundred million of these and brought them into the United States for sale. And suppose they successfully sold them, but it was all after the fact, after McCarty started. But they developed this plan afterwards, and they didn't do it for the purpose of chasing McCarty out. They did it because they thought it was a great idea. And we had a record on that. You still have the same position? No, I think, again, no. I think in the scenario you just described, if it was in, you know, planning, if it was in anticipation. I'm not saying that. It was after McCarty did it, they said, this is a good idea, and we own the copyright. So we're going to, like, go all out to sell this stuff. Not because we were trying to get rid of McCarty, because when they sold it, it's really a good idea. And we own it. They don't. So, I mean, honestly, for you to say that's okay is completely inconsistent with your position. Well, I thought you indicated that it was done, like, it was already in the works before. No, I'm not saying it was done, but I'm saying it was absolutely clear that, I mean, that they were, they went all out at that point. And they, you know, they didn't just stick a toe in the water. They produced, you know, piles of it. They had all kinds of factories set up to do this. They were doing it. You know, if they own the mark, they need to, what they can't do, what the Lanham Act precludes you from doing is creating confusion. You can't inject confusion into the marketplace. And if they do that, then they run the risk in that scenario that you just described. But, so where are you getting this rule that they can't create the confusion if they own the mark? And they have a right to do it. Because the Lanham Act is designed to avoid and eliminate confusion. But it does it in certain ways, and there's nothing in it that bans somebody who owns a mark from using it in a confused way. They own it. There needs to be a bond. They're the ones who own it. It's the other people who have the problem because they're, when you have confusion. There needs to be a bona fide intent to use before the, before you can enter that into the marketplace. And if there is something that. That's exactly why I gave you my hypothetical. My hypothetical assumes an absolutely bona fide intent to use. Before seeing the other, the defendant in that scenario. Why, where is the before seeing the other? I'm asking, I'm just not understanding. Where is before seeing the other use come from? I'm asking if that's your hypothetical. No, my hypothetical is that it was, that they had at the beginning an intent to use it, but they didn't know exactly how they were going to use it. And then they thought, oh, this is a great idea. And we own the mark and we're going to use it. And this way, and they go all out. But an effort to, to, so they had to have a bona fide intent to use it before, before making the, or with their application to, to, to, for the intent to use application. That scenario that they, it could be different. Yeah. All extremely interesting. Anything about damage? Uh, sure, Your Honor. So, uh, on, on damages, the, look, I think the ultimate question is we, there's really no showing below as to what injury, uh, Lodestar may or may not have suffered. And, and that's really the fundamental problem that, you know, the, the, uh, on a reasonable royalty, you need obviously willing parties and there's a, there's a standard set up that they fail to achieve. There's no evidence of any prior license negotiations with other third parties as the court found below. There's no evidence of what royalty rate Lodestar would have sought had it planned to license the untamed wordmark. And the only evidence that's in the record of a royalty rate is between Lodestar and Avalon, this 10%, which Andre Levy, who is the principal of both negotiated on behalf of both parties in November of 2018. And this is years after the complaint was filed in this case. And it's just another point to show what, what the purpose here was. So there's no prior trademark license agreement. They've never, these parties have never had any negotiations like that. And the plaintiff had never previously licensed at work. There's just not sufficient evidence to put that question in front of a jury. So is your problem with the inadequacy with regard to the amount or the inadequacy with regard to whether there would have been a license? There should not be a license here. There's no, there's no evidence from which a reasonable rational to try or a fact could deduce that there would be a, a, a reasonable royalty rate agreed to here, that the parties would agree to a reasonable royalty rate. There's no evidence from which it's completely speculated right now. There's no royalty, a measure of damages rather than a prediction as to what would have actually happened. No, in this scenario, there needs to be a prediction as to what the parties would have agreed to. That's the only way that you can- As to amount, but, but as to whether they would have agreed to a construct essentially that says one way to figure out the worth of this thing that was misused is what a reasonable royalty would have been, whether or not there would have actually been a reasonable royalty. I understand the reasonable part has to have some keys, but the fact that it would have actually happened, I don't know that it does. So you're asking me to assume that they would agree? No, I'm asking you to say, this is a construct where it doesn't matter whether they would actually agree, although you do have to make some projections about if they had negotiated, what would they have come to? That's a different question. No, definitely not. The standard requires some evidence that the parties would, would do this, would, would agree to, both sides would agree to a- In this case, that's a point of proposition. I understand that's usually how it comes up, but do you want to- Yes. He says that he has some cases to the contrary. I don't know what they are, and I don't know what you mean by that. What's that? He said that he has some cases to the contrary that say it doesn't matter whether they would have actually agreed, and I understand that in the cases, usually were in the context where there was negotiations or some history, but is there any case that says there has to be? Yeah, so I think the cases we cite on page 52 of our brief, we, we're, it sets forth how courts reach sufficiently reliable bases in only three circumstances, and we cite the Ballard Brothers case, U.S. Wholesale, and Adidas. Okay, your time is up. Thank you very much. Thank you. All right, thank you, Your Honor. I first want to address Bacardi's admission that under this fact scenario, Lodestar had the right to use untamed on rum. So under Bacardi's theory, what could happen is two parties could sell the same product using the same trademark, and neither one could stop the other one. Lodestar would have the right to use it. Bacardi couldn't stop them. And under Bacardi's theory, Lodestar couldn't stop Bacardi from using their, and they could have picked the same mark on the same product, and there's nothing that could, either party could do to stop the other. That would lead to consumer confusion. Two parties using the same mark on the same product, and neither side can stop the other. That's certainly not the result that Congress had for the Lanham Act to avoid consumer confusion. I'd also like to address the issue on whether or not there is a case on this issue. The statute is clear that there is constructive use. The idea of constructive use is that once you have actual use, it's legally deemed to have taken place at the time of the priority date. So the fact that there might not be a case on this doesn't mean that it's not being considered. It's explicitly dealt with in the statute. And there are two district court cases that dealt with this very same fact pattern, where you had someone file an intent to use application, infringement began, and then the trademark owner began using the mark after that. And in both of those cases, the court considered the use that happened after the infringement started, considered that in the likelihood of confusion, and in both cases, they entered preliminary injunctions against the infringer. And the reason why is because the trademark law basically allows the owner, you put a stake in the ground and a flag. You say, look, I own the rights for untamed for wrong. I'm going to develop that product in the future. Infringers beware. If you want to develop another product like that before I come out with mine, you can do it, but you run the risk of if the trademark owner then comes out with the product, you get trademark priority and you get constructive use. Can I quickly just address the damages issue? Well, very. OK. The Adidas case found that where the parties don't have to have agreed, because if the standard was the defendant would have had to agree, they could always say, well, we never would agree to that, and that basically eliminates reasonable royalties as a damages theory. The other thing that- No, wait a minute. The claim here isn't that the defendant wouldn't have agreed, but that the plaintiff wouldn't have sought it. Well, the plaintiff, the whole business model of the plaintiff was to develop a product to license to a larger company like Bacardi or Diageo. So if Bacardi's argument is that Lodestar didn't have an intent to license the mark, that's completely belied by the record on below. The other quick point I'd like to make is that Dr. Luna's expert report, she did an analysis of other licenses. She found 22 comparable licenses in the alcohol market. That goes to a mountain. So much of it. Anyway, your time is up. Okay. Thank you. Thank you, Your Honors. Welcome here for your very useful arguments and a very- Am I able to respond? I'm sorry? Am I able to respond? That's not how we do it. So Lodestar versus Bacardi is submitted and we are adjourned. Thank you.
judges: Baldock, Berzon, Collins